UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J.M. o/b/o S.M.T.,

     Plaintiff,

v.

GENESEE INTERMEDIATE
SCHOOL DISTRICT and FLUSHING
COMMUNITY SCHOOLS,

     Defendants.

Case No. 23-12896
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [21] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [23]**

---

Plaintiff J.M. on behalf of her autistic minor son S.M.T. alleges that Genesee Intermediate School District and Flushing Community Schools violated the Individuals with Disabilities Education Act by refusing to change his educational placement from Elmer Knopf Learning Center to a residential setting. The Court concludes, like the administrative law judge below, that Defendants did not violate the IDEA—specifically, that Elmer Knopf is an appropriate placement for S.M.T. under the Act, while a residential setting is not. The Court thus grants Defendants' motion for summary judgment (ECF No. 21) and denies Plaintiff's (ECF No. 23).

## I.

The relevant facts from the administrative record are not in dispute. S.M.T. is a 15-year-old Genesee County resident (16 years old next month) with "severe autism," "severe seizure disorder," and "severe behavioral issues that cause him to

act out and become violent primarily toward himself but also toward others." (ECF No. 20, PageID.808 (ALJ decision); *see* ECF No. 20-1, PageID.1712–1713 (psychiatry service log listing diagnoses "Epileptic Encephalopathy, cognitive impairment, Autism Spectrum Disorder and associated behavioral dysregulation and sleep disorder").) He is mostly nonverbal. (ECF No. 20, PageID.808, 1160.)

When S.M.T. was 9 years old, his family moved to Michigan, and he began attending Elmer Knopf Learning Center in the Genesee Intermediate School District. (*Id.* at PageID.1139, 1209; ECF No. 20-1, PageID.1621.) Elmer Knopf is a specialized school "for students eligible with moderate cognitive impairments and students eligible with autism spectrum disorder that function in the moderate range. The program provides academic, employment, social, communication, gross and fine motor skills development." (ECF No. 20-1, PageID.1281.) The school uses an evidence-based tiered system called "positive behavior interventions and supports" ("PBIS") (*id.* at PageID.1271), where all students receive behavioral supports as a baseline ("Tier One") and students "still exhibiting some challenging behaviors" receive additional levels of more targeted supports (ECF No. 20, PageID.874). S.M.T. received the highest level of support ("Tier Three"). (*See id.* at PageID.1258; ECF No. 20-1, PageID.1279.) He attended Elmer Knopf for fourth, fifth, and sixth grade during the 2019–22 school years. (ECF No. 20-1, PageID.1284, 1300, 1322.)

At the start of sixth grade, around September of 2021, J.M. requested that Defendants change her son's educational placement from Elmer Knopf to a full-time residential setting. (ECF No. 20, PageID.1248; *see id.* at PageID.262; ECF No. 20-2,

PageID.1811, 2252.) She was concerned that S.M.T. was "not progressing in school" and "was growing increasingly more aggressive and self-harmful." (ECF No. 23, PageID.2307; *see* ECF No. 20, PageID.1248 (S.M.T.'s 2021–22 IEP) ("[Parent] has requested that the district place the student in a residential facility in Kansas due to the student's behavioral difficulties.").) Defendants denied that request and subsequent ones. (*See* ECF No. 20, PageID.876–877, 962; ECF No. 20-1, PageID.1268.) In June of 2022, in advance of the 2022–23 school year, J.M. withdrew S.M.T. from Elmer Knopf, and he did not return for seventh grade.[1] (ECF No. 20, PageID.1615–1617.)

In October of 2022, Plaintiff filed a due process complaint with the Michigan Department of Education. (ECF No. 20-2, PageID.2242–2253); *see* 20 U.S.C. § 1415(b)(6). In May of 2023, an administrative hearing was held before an ALJ. (*See* ECF No. 20, PageID.769–770); 20 U.S.C. § 1415(f)(1)(A). Over the course of four days, fourteen witnesses testified on direct and cross examination and in response to occasional questions from the ALJ: (1) J.M.; (2) S.M.T.'s older brother; S.M.T.'s (3) neurologist and (4) psychiatrist; (5) the psychiatric fellow who cared for S.M.T. during a winter 2022 hospitalization; (6) a CPS investigator; S.M.T.'s (7) most recent teacher, (8) former teacher, (9) occupational therapist, and (10) bus driver; the school district's (11) superintendent and (12) former compliance monitoring supervisor, and the Elmer Knopf (13) principal and (14) school nurse. (*See* ECF No. 20, PageID.775–807,

---

[1] The parties suggested during status conferences with the Court that S.M.T. did eventually return to Elmer Knopf at some point and for some period during the pendency of this litigation.

818, 853, 871, 944, 1134.) Twenty-one exhibits were also admitted into evidence. (*Id.* at PageID.770–771; *see id.* at PageID.1209–1263; ECF No. 20-1; ECF No. 20-2, PageID.1762–2088.) These included letters from the psychiatric fellow and S.M.T.'s neurologist (ECF No. 20-2, PageID.2083–2088) as well as S.M.T.'s annual IEPs (ECF No. 20, PageID.1225–1263; ECF No. 20-1, PageID.1265–1282), corresponding progress reports (ECF No. 20-1, PageID.1283–1345), functional behavior assessment and behavior intervention plan (*id.* at PageID.1370–1390), and behavior incident reports (*id.* at PageID.1391–1614). The ALJ granted the parties' joint request to submit post-hearing briefs. (ECF No. 20, PageID.820–844.) The resulting administrative record, which the Court has carefully reviewed, is just shy of 1,500 pages. (ECF Nos. 20, 20-1, 20-2.)

On August 16, 2023, the ALJ issued a 50-page opinion dismissing J.M.'s due process complaint. (ECF No. 20, PageID.769–818.) He concluded, among other things, that "School staff were and are credible, caring, and knowledgeable," that S.M.T. "achieved appreciable educational benefit" at Elmer Knopf, that "Mom clearly cares for her son and wants what is best for him," and, ultimately, that Elmer Knopf, and not a residential setting, was the appropriate placement for S.M.T. (*Id.* at PageID.814–816.)

Pursuant to 20 U.S.C. § 1415(i)(2)(A), Plaintiff appealed the ALJ's decision to this Court. Now before the Court are the parties' cross-motions for summary judgment. (ECF Nos. 21, 23.) The parties did not ask the Court to hear additional evidence. *See* 20 U.S.C. § 1415(i)(2)(C).

4

## II.

When reviewing a state administrative IDEA determination, district courts in the Sixth Circuit apply a "modified" *de novo* standard. *See L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 790 (6th Cir. 2018). That is, courts may not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998), but neither may they "substitute their own notions of sound educational policy for those of the school authorities which they review," *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). This Court must determine based on a preponderance of the evidence whether the requirements of the IDEA were met while giving "due weight" to the ALJ's findings. *Knox County v. M.Q.*, 62 F.4th 978, 990 (6th Cir. 2023); *see* 20 U.S.C. § 1415(i)(2)(C) (providing that the reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate").

Giving "due weight" to the state administrative decision means "(1) setting aside [the ALJ's] findings *only* where 'the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both'" and "(2) deferring to the ALJ on matters involving educational expertise." *Knox County*, 62 F.4th at 990 (quoting *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 567 (6th Cir. 2000)); *see also Deal v. Hamilton Cnty. Bd.*

*of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation."); *accord S.M. v. Mass. Dep't of Educ.*, No. 07-11440, 2009 U.S. Dist. LEXIS 143272, at *3 (D. Mass. Mar. 9, 2009) ("The Court cannot compel a school district to provide more than the law requires, nor can a judge—or a parent—substitute her own judgment about educational success for that of the school administrators and [administrative] hearing officers who wrestle with these issues daily.").

## III.

It is undisputed that S.M.T. is a student with a disability as defined by the Individuals with Disabilities Education Act. 20 U.S.C. § 1401(3); *see generally id.* §§ 1400–1482. So Defendants, as recipients of federal funding under the Act, must provide S.M.T. with a "free appropriate public education" ("FAPE")—i.e., "special education and related services designed to meet [S.M.T.'s] unique needs and prepare [him] for further education, employment, and independent living." *Id.* § 1400(d)(1)(A); *see id.* §§ 1401(9), 1412(a)(1); *accord S.B. v. Murfreesboro City Sch.*, No. 15-0106, 2016 U.S. Dist. LEXIS 31675, at *14 (M.D. Tenn. Mar. 11, 2016) ("In general, the IDEA aims to ensure that every child has a meaningful opportunity to benefit from public education."). A FAPE has two requirements relevant here.

First, S.M.T. must receive an individualized education program ("IEP") "reasonably calculated to enable [him] to make progress appropriate in light of [his]

circumstances."[2] *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017); *see* 20 U.S.C. §§ 1401(9), 1401(14), 1414(d). Because "the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome, . . . the IEP's substantive 'educational benefits' are best measured under the paradigm of 'appropriate progress' based 'on the unique circumstances of the child for whom it was created.'" *L.H.*, 900 F.3d at 788–89. "Appropriate progress" and "meaningful educational benefit" refer not only to formal academic skill building but, for students like S.M.T., also to "basic self-help and social skills such as toilet training, dressing, feeding, and communication." *Brown ex rel. Brown v. Wilson Cnty. Sch. Bd.*, 747 F. Supp. 436, 443 (M.D. Tenn. 1990) (cleaned up); *see also L.H.*, 900 F.3d at 792 n.5 (explaining that the Sixth Circuit's "meaningful educational benefit" standard is "functionally the same" as the "appropriate progress" standard set out by the Supreme Court).

Second, S.M.T. must be educated in the "least restrictive environment" ("LRE") possible. 20 U.S.C. § 1412(a)(5). That is, "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled." *Id.* The Act thus recognizes that some students require more restrictive learning environments in order to access meaningful educational benefit. *See id.* ("[S]pecial

---

[2] In addition to this substantive requirement, the IDEA imposes a procedural requirement: school districts must "compl[y] with the procedures set forth in the IDEA." *G.A. v. Williamson Cnty. Bd. of Educ.*, 594 F. Supp. 3d 979, 986 (M.D. Tenn. 2022); *see Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001) (explaining that procedural noncompliance only amounts to a violation of the IDEA if it resulted in "substantive harm" to the plaintiff). But the Court need not analyze this requirement here. *See infra* note 4.

classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."); *see also Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983) (setting out three situations in which a disabled student's segregated placement may be appropriate under the IDEA: the student would not benefit from regular education, any educational benefits in a non-segregated setting would be "far outweighed" by the benefits of the segregated setting, or the student would be a disruptive force in the non-segregated classroom); *R.S. v. Highland Park Indep. Sch. Dist.*, 951 F.3d 319, 334 (5th Cir. 2020) ("[S]chools are required to offer a 'continuum of services' that might, where appropriate, include 'placing the child in regular education for some academic classes and in special education for others, mainstreaming the child for nonacademic classes only, or providing interaction with nonhandicapped children during lunch and recess.'"). And in some cases a student may be placed in a full-time residential setting, the most restrictive of learning environments, at his school district's expense—but only if the placement is "*necessary* to provide special education and related services." 34 C.F.R. § 300.104 (emphasis added).

The Sixth Circuit has cautioned that a segregated learning environment that provides educational benefit, even "superior" benefit, but is more restrictive than necessary is not "appropriate" under the IDEA. *Roncker*, 700 F.2d at 1063. "In a case where the segregated facility is considered superior, the court should determine

whether the services which make that placement superior could be feasibly provided in a non-segregated setting. If they can, the placement in the segregated school would be inappropriate under the Act." *Id.*; *see also L.H.*, 900 F.3d at 789 (explaining that "a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming" and in turn concluding that the IDEA's least-restrictive-environment requirement is a "*non-academic* restriction or control on the IEP—separate and different from the measure of substantive educational benefits").

Plaintiff contends that residential placement is necessary here.[3] So she bears the burden, as the party challenging the school district's IEP and placement decision, of showing both that Elmer Knopf failed to provide S.M.T. with a FAPE and that residential placement is appropriate under the Act. *See L.H.*, 900 F.3d at 790 (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005)) (describing burden of proof in IDEA appeals); *Bd. of Educ. v. Patrick M.*, 9 F. Supp. 2d 811, 825 (N.D. Ohio 1998) (describing burden when appellant contests placement decision), *remanded as moot on other grounds*, 215 F.3d 1325, 2000 WL 712500 (6th Cir. 2000) (per curiam) (unpublished table decision); *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 519–20 (6th Cir. 2003) (describing parents' burden when seeking reimbursement under IDEA for private special education).

---

[3] The parties do not dispute that a segregated setting is appropriate for S.M.T. That is, they "agree that Student will need to be educated exclusively with other disabled students but disagree about whether Student can be educated at [Elmer Knopf] or requires a residential placement." (ECF No. 20, PageID.811.)

Crucially, to warrant the most restrictive learning environment, Plaintiff must demonstrate that "full time residential placement is necessary for educational purposes as opposed to medical, social, or emotional problems that are separable from the learning process." *Tenn. Dep't of Mental Health v. Paul B.*, 88 F.3d 1466, 1471 (6th Cir. 1996) (citing *Kruelle v. New Castle Cnty. Sch. Dist.*, 642 F.2d 687, 693 (3d Cir. 1981)). The IDEA requires that states pay for special educational services in residential settings when necessary to ensure a disabled student's access to education; it does not require reimbursement of residential treatment costs when necessary for only medical, social, or emotional needs that are separable from educational ones. *See id.* at 1474 ("[T]he purpose of [IDEA] is not to provide free residential psychiatric treatment for a seriously emotionally disturbed child, but to provide for his special educational needs.").

In other words, Plaintiff must show by a preponderance of the evidence that (1) Defendants' non-residential placement is *not* reasonably calculated to provide educational benefit appropriate to S.M.T.'s unique needs and that (2) a residential placement *is*. And to satisfy her burden as to the latter requirement, Plaintiff's evidence must show that residential placement is necessary for educational purposes, not for medical needs that are segregable from the learning process. *Kruelle*, 642 F.2d at 693; *see Brown*, 747 F. Supp. at 442 ("The threshold issue in determining the appropriateness of the [residential] placement is whether it is educational, or medical, in nature.").

Plaintiff fails to carry her burden as to either requirement.

10

## A. Placement at Elmer Knopf

### 1. Alleged Lack of Progress

Plaintiff first contends that Elmer Knopf "did not provide meaningful educational benefits that were more than trivial or *de minimis*." (ECF No. 23, PageID.2323.) She says that S.M.T.'s teacher testified about "three main goals for S.M.T. in the IEP: (1) utensil use, (2) naming numbers, and (3) identifying letters" and that, on two of the three goals, the teacher "reported minimal to no progress, to the extent that she 'was unsure if he was going to actually meet that goal by his next IEP.'" (*Id.* at PageID.2323–2324 (quoting ECF No. 20, PageID.890).) Plaintiff in turn asserts that "S.M.T. did not receive . . . meaningful [educational] benefit" from Defendants, in violation of the IDEA.[4] (*Id.* at PageID.2324.) There are several problems with this argument.

First, the record evidence does not bear out Plaintiff's assertion. To the contrary, ample evidence supports that S.M.T. did make progress at Elmer Knopf.

---

[4] Plaintiff includes the same arguments under the heading that "Defendants did not comply with the procedures set forth in the IDEA." (ECF No. 23, PageID.2323.) But she cannot transform her substantive arguments into procedural ones by simply labeling them as such. "Procedural violations generally concern 'the preparation of an IEP,' such as the evaluation, placement, and IEP-formation procedures outlined in § 1414." *L.H.*, 900 F.3d at 789. Plaintiff makes no arguments to that effect in her motion, nor did she make such arguments in the administrative proceedings. (*See* ECF No. 21, PageID.2266); *see also F.C. v. Tenn. Dep't of Educ.*, 745 F. App'x 605, 608 (6th Cir. 2018) (explaining the IDEA's administrative exhaustion requirement). The undisputed crux of this IDEA appeal is substantive—whether Elmer Knopf is an appropriate placement for S.M.T. or whether Defendants denied S.M.T. a FAPE by failing to place him in a residential setting. The Court need only address the content of Plaintiff's arguments, not their labels.

Start with the evidence Plaintiff cites in support of her claim: hearing testimony by S.M.T.'s teacher, Nancee Walker, that by April of 2022 S.M.T. was making "minimal to no progress" on two of the "three main goals" in his IEP. (*Id.* at PageID.2323–2324; *see id.* at PageID.2314, 2335.) True, Walker testified that, as of April 2022, S.M.T. was "[n]ot where we would like him to be" with respect to two of his IEP goals—utensil use and number identification—and that she was "unsure if he was going to actually meet [those goals]" by his next benchmark in August. (ECF No. 20, PageID.890–891.)

But Walker testified to much more. She elaborated that she was not concerned about S.M.T.'s results. (*Id.* at PageID.890 ("Q: So did his lack of progress on this . . . goal . . . give you concern at this point? A: Not at that time because I was certain that once he got back to his baseline, like his normal school behavior and routines, that he would be able to continue to make progress.").) She explained that there were various factors she saw as contributing to S.M.T.'s lack of progress at that time. (*See id.* at PageID.890.) For example, the April 2022 progress report reflected S.M.T.'s results between January and April (ECF No. 20-1, PageID.1336), and winter break had disrupted S.M.T.'s routines (ECF No. 20, PageID.890 ("January and February were a little harder for [S.M.T.]. He came back from [winter] break and had to reestablish routines."); *see also id.* at PageID.802 (ALJ summarizing Walker's testimony) ("January and February of 2022 were difficult for Student between the transition back to School after break, medical issues, and self-harming behaviors. Student was also not eating at School.")). S.M.T. was also on antibiotics for ear

infections during that period, which exacerbated his behavioral issues. (*Id.* at PageID.890; *see id.* at PageID.799 (ALJ summary) ("Student had many ear infections and was often on antibiotics which led to increased behaviors.")); *see also Banwart v. Cedar Falls Cmty. Sch. Dist.*, 489 F. Supp. 3d 846, 869–71 (N.D. Iowa 2020) (finding that student's academic and behavioral regression likely resulted from changes to at-home routine and medication and thus did not demonstrate denial of FAPE or necessity of residential placement).

Walker further testified that occasional stagnation or regression is "not uncommon for students in special education or students with autism." (ECF No. 20, PageID.890; *see id.* at PageID.891 (testifying that "it's not uncommon" for such students to fail to meet IEP goals and to therefore continue their same goals into the next school year); *id.* at PageID.802.) So too Walker clarified that "not progressing" on an IEP goal did not mean S.M.T. was making no progress at all: "It was just a slower progression. . . . It just means that . . . there's a potential that he could not meet that goal by the next IEP meeting." (*Id.* at PageID.891; *see also id.* ("Q: Did it ever resolve itself [that S.M.T. was not eating at school and thus was not making progress on his utensil use]? A: Eventually it did. He started, you know, eating again and kind of getting a little bit back to his—his normal self at school.").)

And as Plaintiff herself acknowledges, Walker testified that as of April 2022 S.M.T. was making progress on his third "main goal" of letter identification. (*Id.* at PageID.890; *see* ECF No. 20-1, PageID.1338 (April 2022 progress report stating that S.M.T. was "[p]rogressing at a rate sufficient to meet the annual goal" for objective of

letter identification and that S.M.T. was able to identify the first several letters in his name with 42% accuracy).) He was also progressing with respect to all three "main goals" throughout the rest of the 2021–22 school year. (*See* ECF No. 20, PageID.889–891.) It was only his April 2022 report that showed a lack of progress on the two goals. (*Compare* ECF No. 20-1, PageID.1327–1335, *with id.* at PageID.1337, 1339.) The ALJ thus concluded, based on Walker's testimony, that "Teacher did her best, with the considerable limitations of the Student, to create an environment where the Student both felt and was safe, and where the Student could learn. To the extent allowed, Teacher was successful, and the Student achieved appreciable educational benefit." (ECF No. 20, PageID.814.)

What is more, S.M.T. had more than those "three main goals" during the 2021–22 school year. He had six total IEP goals, including two aimed at decreasing his aggressive and self-injurious behaviors.[5] And S.M.T. was progressing on all of them—during the April 2022 report period and each other report period that year. (ECF No. 20-1, PageID.1327–1341.) Ample record evidence, which Plaintiff fails to address, supports that S.M.T. made progress at Elmer Knopf and was able to learn. (*See* ECF

---

[5] Plaintiff elsewhere takes issue with not only S.M.T.'s alleged lack of progress on his "three main goals" but also with the goals themselves. She asserts that "[a]voiding [aggressive] behaviors is a 'basic self-help skill' and should be the focus of his formal education.' Nonetheless, Elmer Knopf focused on goals involving utensil use and communication that ultimately S.M.T. made little to no progress on and could not reproduce outside of the classroom environment." (ECF No. 23, PageID.2325–2326.) But, as mentioned, S.M.T.'s IEP did focus on his behaviors. (*See* ECF No. 20, PageID.1255–1256 (setting goals aimed at decreasing (1) "aggressive behavior during the toileting process" and (2) "self-injurious behaviors (biting/hitting himself, hitting his head on hard surfaces/objects) when feeling anxious, frustrated, etc.").)

No. 20, PageID.855–859 (occupational therapist testimony) ("Q: And as this student was making progress based on your report, you were able to work with him enough for him to make progress; right? A: Yes." *Id.* at PageID.859.); *id.* at PageID.887 (principal testimony) ("Q: Okay. Now, in your opinion, Ms. Jason, is Student able to be educated? A: Yes. I believe all students are able to be educated. Q: And do you believe that Elmer Knopf is able to educate this student based on what you've learned? A: Yes."); *id.* at PageID.1178 (former teacher testimony); ECF No. 20-1, PageID.1284–1345 (progress reports for each annual IEP, reflecting consistent progress during each report period); *see also* ECF No. 20, PageID.811 (ALJ decision) ("School staff credibly reported that the Student was making progress on those goals. . . . Their testimony was consistent with their contemporaneous records.").) Based on this evidence, the ALJ concluded that "Student made reasonable progress and did as well as could be expected at School. . . . Student had appropriate, if not particularly lofty, goals appropriate for his level of functioning. . . . A preponderance of the evidence establishes that the Student was making educational gains while enrolled at School." (ECF No. 20, PageID.811.) The Court agrees.

One final note on this point. While a student's progress in relation to his IEP goals is relevant to the question of whether he was given a FAPE, it is not dispositive, despite what Plaintiff may suggest. Indeed, the IDEA requires that an IEP is "reasonably calculated to enable a child to make [appropriate] progress"—not that it ensure such progress. *Endrew F.*, 580 U.S. at 399. Such a requirement would incentivize precisely what the statute was enacted to combat: "instruction that aims

15

so low" as to amount to "[no] education at all." *Id.* at 403. "The IDEA demands more." *Id.* A student's IEP must be "appropriately ambitious in light of his circumstances. The goals may differ, but every child should have *the chance* to meet challenging objectives." *Id.* at 402 (emphasis added). It follows that disabled students, like all students, may not meet their annual educational goals. That does not mean they have not been afforded a FAPE. *See id.* at 398 ("[T]he [*Rowley* court's] statement that the [IDEA] did not 'guarantee any particular level of education' simply reflects the unobjectionable proposition that the IDEA cannot and does not promise 'any particular [educational] outcome.' No law could do that—for any child." (last alteration in original) (quoting *Rowley*, 458 U.S. at 192)); *L.H.*, 900 F.3d at 793 (explaining that student's failure to meet his IEP goals "establishes only that the goals were not appropriately calibrated" and further explaining that "whether [student] was meeting his IEP goals (or even capable of meeting them) is a separate question from whether he was 'making appropriate progress' or 'receiving a meaningful benefit'"); *accord CJN v. Minneapolis Pub. Sch.*, 323 F. 3d 630, 642 (8th Cir. 2003) ("[T]he IDEA does not require that schools attempt to maximize a child's potential, or, as a matter of fact, guarantee that the student actually make any progress at all. It requires only that the student be provided with an IEP that is reasonably calculated to provide educational benefit . . . ."); *Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp. 2d 514, 523 (S.D.N.Y. 2011) ("[W]hile . . . a child's progress is relevant to the court's review, such progress does not itself demonstrate that a private placement was appropriate. The flip side also is true: lack of progress itself does not

16

mean that the parents' placement was inappropriate." (internal quotation marks and citation omitted)).

But again, a preponderance of the evidence shows that S.M.T. was making progress at Elmer Knopf and that his IEP and placement there were reasonably calculated to provide him with meaningful educational benefit. Plaintiff has not carried her burden of showing otherwise.

### 2. Worsening Behaviors

In addition to arguing that S.M.T.'s April 2022 lack of progress on two of his IEP goals demonstrates that Elmer Knopf is an inappropriate placement, Plaintiff asserts that S.M.T.'s "behavioral issues have been worsening." (ECF No. 23, PageID.2325.) She contends that "[t]he lack of progress towards the IEP goals, as well as the safety issues surrounding S.M.T.'s behavior and the fact that he has been injured multiple times while in their care, demonstrate that Elmer Knopf cannot meet the needs of this student." (*Id.* at PageID.2326; *see id.* at PageID.2327 ("Elmer Knopf . . . simply cannot provide [S.M.T.] with an appropriate education, as evidenced by his lack of progress on skills and his increasingly aggressive behavioral issues.").)

S.M.T.'s behavioral issues are undisputed. As the ALJ found, S.M.T. "has severe behavioral issues that cause him to act out and become violent primarily toward himself but also toward others, particularly those who are trying to intervene and prevent the Student from injuring himself. Sadly, these behaviors are not unusual at School." (ECF No. 20, PageID.808; *see id.* ("Student has some known

triggers, but they are inconsistent. The only aspect of Student's behavior that is consistent is his self-harming.").) It is also undisputed that S.M.T.'s aggressive behaviors worsened during the 2021–22 school year and that S.M.T. has injured himself while at school. (*See id.* at PageID.808, 1141–1142, 1249; ECF No. 20-1, PageID.1622–1629, 1646–1709.) But it does not follow that Elmer Knopf is not providing S.M.T. with a FAPE or "cannot meet [his] needs." (ECF No. 23, PageID.2326.)

Recall that S.M.T. received Elmer Knopf's highest level of support ("Tier Three"). This entailed social work support, monthly behavior meetings, and "very targeted interventions and goals around supporting [his] behavior needs." (ECF No. 20, PageID.874 (principal testimony).) He was one of about 60 Elmer Knopf students receiving such supports (*id.*), and he was not the "most challenging" or "most behaviorally severe student" at Elmer Knopf or that school staff had personally worked with (*id.* at PageID.892 (Walker testimony); *id.* at PageID.909 (school nurse testimony); *see also id.* at PageID.880 (principal testimony)).

School personnel testified that they felt appropriately equipped to handle S.M.T.'s behavioral issues and to help him learn. (*Id.* at PageID.892 (Walker testimony) ("Q: And in your opinion did his behavior prevent him from accessing his education in your classroom? A: No, ma'am."); *id.* at PageID.859 (occupational therapist testimony) ("Q: And as this student was making progress based on your report, you were able to work with him enough for him to make progress; right? A: Yes. Q: Okay. Is self-injurious behavior uncommon at Elmer Knopf with the students?

18

A: No, it's not uncommon. Q: Okay. And do you feel that you are appropriately equipped and supported to work with those kids, self-injurious kids, at Elmer Knopf? A: Yes, we are and I am."); *see id.* at PageID.874, 878, 905–907, 1013 (principal, school nurse, and bus driver testifying about staff training for behavioral issues); *see also* ECF No. 21, PageID.2271 ("There was no evidence of any aspect of Student's educational needs that Elmer Knopf was not equipped to handle.").) And, as explained, the record shows that S.M.T. was making progress at Elmer Knopf.

The school also dealt with S.M.T.'s self-injurious behavior. Most notably, in June of 2021, S.M.T. banged his head against the school bus window and broke the glass. (ECF No. 20, PageID.808; *see id.* at PageID.1141–1142; ECF No. 20-2, PageID.2251.) Defendants replaced the school bus windows next to S.M.T. with unbreakable plexiglass, and the incident did not reoccur. (ECF No. 20, PageID.808, 812; *see id.* at PageID.1018–1019 (bus driver testimony); *id.* at PageID.1261 (S.M.T.'s 2021–22 IEP) ("The student had an incident of aggression (June bus incident) which the school addressed through the implementation of additional bus safety measures. Decreasing aggressive behavior during school (and, in particular, during toileting and transition times) will be addressed through goals and objectives, the implementation of a behavior intervention plan, and parent training and support to encourage the generalization of skills across settings (home and school)."); ECF No. 20-1, PageID.1282.)

S.M.T.'s other injuries during the 2021–22 school year are described in eight "accident reports" (ECF No. 20-1, PageID.1622–1629), which school staff sent home

to Plaintiff when S.M.T.'s behaviors resulted in "some kind of mark" or injury (ECF No. 20, PageID.907 (school nurse testimony); *see id.* at PageID.892 (Walker testimony) (explaining that Elmer Knopf uses student accident report forms "on rare occasions . . . where students have a[n] injury at school that's outside the normal")). Walker and the school nurse comprehensively cataloged each bump, scratch, and small cut that happened at school, the self-injurious behaviors that caused them, and the school nurse's assessment and response. (*See id.* at PageID.892, 907; ECF No. 20-1, PageID.1622–1629.)

On October 7, 2021, for example, S.M.T. "put his fingers in the floor drain during toileting and cut the cuticle bed on his left hand middle finger. [There was] minimal bleeding at site of cuticle." (ECF No. 20-1, PageID.1622.) Walker elaborated, testifying that "[t]here was one occasion where [S.M.T.] got upset because we were taking a little too long in the bathroom and he had dropped down to the floor and saw the little drain at the bottom of the floor, decided to put his finger in it, [and] got a little nick on his finger." (ECF No. 20, PageID.885.) Ever since, school staff padded the floor of the bathroom and "would also make sure to have all of his toileting supplies and everything ready so that [they could] get in and out as quickly as [they] needed because [they] knew that behavior-wise if [they] took a little bit longer than expected, then he might be upset." (*Id.*) S.M.T.'s robust behavior intervention plan further details S.M.T.'s "behaviors of concern," "environmental issues and situational variables," and strategies and supports for preventing and responding to various self-injurious and aggressive behaviors. (ECF No. 20-1, PageID.1370–1375.)

Based on this evidence, the Court agrees with the ALJ that "incidents were few and promptly and effectively dealt with." (ECF No. 20, PageID.809 (citing *id.* at PageID.875, 885).) Likewise, "School staff cannot reasonably be expected to prevent all instances of Student's self-harming. The best that School staff can do is minimize the quantity and severity of those instances and report what occurred to Mom. In substantial part, School accomplished this." (*Id.* at PageID.814.) Indeed, the frequency of S.M.T.'s self-injurious behaviors and their inconsistent and unpredictable triggers (*see id.* at PageID.913, 1141–1142, 1153–1154) suggest that Defendants cannot altogether prevent S.M.T. from injuring himself while at school (*see id.* at PageID.815–816 ("Each witness testified that [S.M.T.'s] behavior will never be eliminated but can only hope to be less frequent and severe.")).

So S.M.T.'s worsening behaviors and the fact that he engages in self-injurious behaviors at school are insufficient to satisfy Plaintiff's burden of showing that Elmer Knopf is an inappropriate placement. The evidence supports the opposite conclusion—that, lacking any ability to altogether prevent S.M.T.'s aggressive and self-injurious behaviors, Elmer Knopf handled them effectively and safely, minimized S.M.T.'s injuries, and took steps to prevent incidents from reoccurring.

### B. Residential Placement

Having found that Elmer Knopf provided S.M.T. with a FAPE, it follows that a more restrictive setting is not necessary or appropriate for him to access meaningful educational benefit and that residential placement would thus be inappropriate

under the IDEA. But given that the crux of this dispute is Plaintiff's claim that residential placement is necessary, the Court will briefly address the issue.

Plaintiff's arguments that residential placement is appropriate for S.M.T. are largely repetitive of her arguments that Elmer Knopf is not. (*See* ECF No. 23, PageID.2323–2328.) In essence, she contends that Elmer Knopf's alleged failures show why S.M.T. needs a residential educational setting. But even if the Court had concluded that Elmer Knopf failed to provide S.M.T. with a FAPE, that would not be enough to carry Plaintiff's burden of proof as to the necessity and appropriateness of a residential placement. Instead, Plaintiff must offer evidence that "full time residential placement is necessary for educational purposes as opposed to medical, social, or emotional problems that are separable from the learning process." *Paul B.*, 88 F.3d at 1471. She has not done so.

Plaintiff first suggests that residential placement is *medically* beneficial or necessary. She asserts that "S.M.T.'s neurologist testified that residential placement is 'necessary.' His psychiatrist wrote a letter to the school requesting residential placement." (ECF No. 23, PageID.2326 (quoting ECF No. 20, PageID.1151 (neurologist testimony)); *see* ECF No. 20-2, PageID.2087–2088 (psychiatrist letter).) She does not elaborate.

But neither the neurologist's testimony nor the psychiatrist's letter "address [S.M.T.'s] educational needs or whether [residential placement] is the solution for those needs." *S.H. v. Rutherford Cnty. Schs.*, 334 F. Supp. 3d 868, 876 (M.D. Tenn. 2018); *accord S.M.*, 2009 U.S. Dist. LEXIS 143272, at *26. To the contrary, as the

22

ALJ concluded, "[t]he focus of Child Neurologist's testimony was medical and behavioral, not educational," and "[b]oth Psychiatrist and Psychiatric Fellow's testimony focused on the Student's medical and behavioral needs, not his educational benefit." (ECF No. 20, PageID.815; *see id.* PageID.1151 (neurologist testimony) ("Q: [D]o you believe that it would be beneficial to the child to receive 24-hour, one-on-one care in a residential placement facility? A: I think that's what he needs. . . . S.M.'s level of behavior is such that . . . I know that I would not be able to live with him. I don't know how his mother does. . . . [H]e needs high level care and . . . I think 24/7 attendant care is not unreasonable."); ECF No. 20-2, PageID.2088 (psychiatrist letter) ("In my professional opinion, [S.M.T.] would likely benefit from a higher level of care than his family can provide independently at home. Family has expressed interest in long-term residential placement, which I believe would be a reasonable option to meet his level of needs.").) That outside of school, and despite the remarkable efforts of his loving family, S.M.T. likely needs greater assistance with his day-to-day care, does not mean the IDEA requires the Defendants to provide residential placement.

In *S.H. v. Rutherford County Schools*, 334 F. Supp. 3d 868 (M.D. Tenn. 2018), the plaintiff parents fell similarly short. There, the Middle District of Tennessee concluded that the defendant school district had failed to provide the student with a FAPE, in part because it had never established a Behavior Intervention Plan despite the student's documented behavioral issues. *See id.* at 875. But the court's conclusion that the defendant had violated the IDEA did not mean that the court agreed with

the plaintiffs that the student required residential placement to access meaningful educational benefit—because the plaintiffs had failed to carry their burden as to that independent question. *See id.* at 876–77 (quoting *Paul B.*, 88 F.3d at 1471).

There, as here, the plaintiffs' evidence "suggests a need for residential treatment to address psychological problems[] [but] does not address [the student's] educational needs or whether [the residential school] is the solution for those needs." *Id.* "Simply put," explained the court, "Plaintiffs have not shown that placement is appropriate within the meaning of 20 U.S.C. § 1415(i)(2)(B)." *Id.* at 877; *see id.* ("The preponderance of the evidence weighs heavily against a finding that S.H. needs residential placement . . . to meet her educational needs."); *accord M.G. v. McKnight*, 653 F. Supp. 3d 202, 213–14 (D. Md. 2023) (concluding that plaintiffs failed to establish necessity of residential placement and reasoning that "Plaintiffs' witnesses focused on the benefits a residential program would have for addressing M.G.'s behavioral difficulties at home" but failed to establish that "those difficulties are not 'segregable from the learning process'" or that "M.G. *requires* those after-school supports to access a FAPE in school"). So too here. It is not enough for Plaintiff to say that residential placement is necessary. Nor is it enough for her to argue only that Elmer Knopf is an inappropriate placement. Neither argument is sufficient to justify residential placement under the IDEA.

Plaintiff next asserts that "S.M.T.'s behaviors and medical needs are not segregable from the learning process." (ECF No. 23, PageID.2327.) In support of that assertion, she says that S.M.T.'s teachers "acknowledged [S.M.T.'s] aggression and

the impact it had on his ability to learn." (*Id.*) Specifically, says Plaintiff, "Walker testified that [S.M.T.] had, in fact, regressed in part due to his behavior issues" (*id.*) and "testified that students with autism tend to show regression in their learning, . . . confirming that learning and a child's behavior are intricately intertwined" (*id.* at PageID.2313 (quoting ECF No. 20, PageID.890)).

But Plaintiff goes too far. Showing that S.M.T.'s behaviors impacted or impeded his educational progress at different points is not the same as showing that S.M.T.'s medical and educational needs are so intertwined that it would be impossible to separate them or to address one without addressing the other. Nor does the close relationship between "learning and a child's behavior" (*id.*), as a general matter, mean that the two are *nonsegregable* for purposes of the IDEA so as to warrant a student's placement in a full-time residential setting. To conclude otherwise would mean calling into question not only the very model of Elmer Knopf and schools like it throughout the country (*see* ECF No. 20, PageID.874–876, 882) but also the least restrictive environment mandate that is central to the IDEA, *Roncker*, 700 F.2d at 1063. Put another way, Plaintiff suggests that residential placement is necessary because S.M.T.'s educational needs are *not entirely independent* from his medical, social, or emotional ones. But that is not the relevant inquiry. It is undisputed that S.M.T.'s medical, social, and emotional needs impact his education to some extent— it is for that reason that the IDEA, and schools like Elmer Knopf, exist. What Plaintiff must show is that S.M.T.'s medical needs and educational needs are so intertwined that they are "nonsegregable," and she fails to make that showing. *See, e.g., S.B. v.*

25

*Murfreesboro City Sch.*, No. 15-0106, 2016 U.S. Dist. LEXIS 31675 (M.D. Tenn. Mar. 11, 2016) (elucidating the sort of evidence that can establish that a student's behavioral and educational needs are inseparable and, likewise, that residential placement is necessary and appropriate).

For instance, "No witness testified that [S.M.T.] needs residential placement to effectively learn." (ECF No. 20, PageID.815.) To the contrary, as explained, multiple witnesses testified that S.M.T. was learning and making progress at Elmer Knopf. That S.M.T.'s behavioral issues may impact his learning is not alone enough. As the ALJ aptly explained, "[w]hile it is axiomatic that a Student that is out of control behaviorally or medically necessarily cannot learn, it does not follow that minimizing the Student's behavior will maximize the Student's learning. . . . No witness testified what additional educational benefit would be available to Student if his behavior was more controlled." (*Id.* at PageID.815–816.) In other words, even if a residential placement were to minimize S.M.T.'s behavioral issues, it does not follow that S.M.T.'s "educational benefit [would] be improved in a residential placement, much less that residential placement is necessary for [him] to achieve a FAPE." (*Id.* at PageID.816.) Thus, the Court agrees with the ALJ that Plaintiff fails to establish, and the record does not support, that a residential setting is necessary for educational purposes or that S.M.T.'s medical needs are inseparable from his educational ones.

## IV.

For the reasons above, the Court GRANTS Defendants' motion for summary judgment (ECF No. 21), DENIES Plaintiff's motion for summary judgment (ECF No. 23), and AFFIRMS the August 16, 2023, decision by the ALJ.

The Court repeats the final paragraph of the ALJ's opinion: "[This] Decision will, no doubt, be incredibly disappointing to the [Plaintiff]. The [Court] hopes that the [parties] can start fresh with a clean slate, that the Student is returned to School, and that Student continues to receive educational benefit from that resumed schooling. The [Court] wishes Mom, Student, and their family all the best with this incredibly difficult endeavor." (ECF No. 20, PageID.816.)

SO ORDERED.


Dated: September 30, 2025


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE